**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LORI OBERSON, Legal Guardian for
Brian Musselman, an incapacitated
person; KIMBERLEE MUSSELMAN,
individually and as the Natural
Mother of Devon Musselman, a
minor,
              *Plaintiffs-Appellees,*

                  v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, FOREST SERVICE,
    *Defendant-Third-Party Plaintiff-*
                  *Appellant,*

                 and

STATE OF MONTANA, by and
through the Department of Fish,
Wildlife and Parks; WEST
YELLOWSTONE CHAMBER OF
COMMERCE,
            *Defendants-Third-*
            *Party Plaintiffs,*

                  v.

JAMIE LOUIS LEINBERGER; PATRICK
B. KALAHAR; TIM A. JOHNSON,
            *Third-Party Defendants.*

Nos. 04-35268
      04-35315

D.C. No.
CV-99-00048-DWM

AMENDED
OPINION*

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

*This amended opinion supersedes our previous opinion in this matter
reported at 441 F.3d 703 (9th Cir. 2006)

1469

Argued and Submitted
December 7, 2005—Seattle, Washington

Filed January 30, 2008

Before: Ronald M. Gould and Marsha S. Berzon,
Circuit Judges, and William W Schwarzer,** District Judge.

Opinion by Judge Schwarzer

---

**The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

## COUNSEL

Counsel for Plaintiffs/Appellants Lori Oberson, Legal Guardian for Brian Musselman, Kimberlee Musselman, individually and as Natural Mother of Devon Musselman, a minor,

Tom L. Lewis
Lewis Slovak & Kovacich
P.O. Box 2325
Great Falls, MT 59403

and

Andrew D. Huppert
Petit Hock & Huppert
P.O. Box 8718
111 N. Higgins Avenue
Missoula, MT 59807

Counsel for Defendant/Third-Party Plaintiff/ Appellee United States Department of Agriculture, Forest Service

Bernard F. Hubley
USHE - Office of the U.S. Attorney
901 Front Street
Helena, MT 59626

and

H. Thomas Byron, III
U.S. Department of Justice
Civil Division/Appellate Staff
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Counsel for Defendant/Third-Party Plaintiff State of Montana, by and through the Department of Fish, Wildlife and Parks

Lucy T. France
Garlington Lohn & Robinson, PLLP
P.O. Box 7909
199 West Pine
Missoula, MT 59807-7909

Counsel for Defendant/Third-Party Plaintiff West Yellow-
stone Chamber of Commerce
Gig A. Tollefsen
Berg Lilly & Tollefsen
1 West Main Street
Bozeman, MT 59715

Counsel for Third-Party Defendant Jamie Louis Leinberger
Jamie Louis Leinberger
303 South Dean
Bay City, MI 48706

Counsel for Third Party Defendant Patrick B. Kalahar
Marshal L. Mickelson
Corette Pohlman Allen Black & Carlson
Mayer Building
129 West Park Street
P.O. Box 509
Butte, MT 59703

Third-Party Defendant Tim A. Johnson
No Appearance

---

## OPINION

SCHWARZER, District Judge:

### I.  PROCEDURAL BACKGROUND

Brian Musselman (Musselman) was gravely injured in a

snowmobile accident on a National Forest trail. Lori Oberson, his legal guardian, and others brought this action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680, alleging that the United States Forest Service negligently failed to correct or warn of a dangerous condition on the Big Sky snowmobile trail where Musselman was injured. The United States filed a third-party complaint against Jamie Leinberger (Leinberger), Patrick Kalahar (Kalahar) and Tim Johnson (Johnson), alleging that their negligence caused Musselman's injuries. Default was taken against Johnson. Kalahar settled with plaintiffs and was dismissed before trial. Following a bench trial, the district court entered judgment for Lori Oberson as guardian for Musselman against the United States in the amount of $4,518,720 and against Leinberger for $5,648,400.[1]

The Forest Service timely appealed, citing as error the district court's refusal to apply the discretionary function exception of the FTCA and its finding of negligence. Plaintiffs cross-appealed from the district court's liability allocation of 50% to third-party defendants and its methodology for calculating life expectancy.[2] We certified to the Montana Supreme

---

[1] The opinion of the district court is reported at 311 F. Supp. 2d 917 (D. Mont. 2004).

[2] Plaintiffs advance three contentions on their cross-appeal. We find each to be without merit.

First, they contend that the district court erred in holding Kalahar and Leinberger jointly and severally liable for Musselman's injuries and thereby apportioning 50% of the liability to Leinberger, the remaining tortfeasor. The court correctly rejected plaintiffs' argument that a meeting of the minds had to be proven to establish joint and several liability, relying on the leading case of *Summers v. Tice*, 199 P.2d 1 (Cal. 1948), which held that where two tortfeasors are each negligent but it cannot be determined whose negligence was the actual cause of the injuries, each is liable for the entire damage. *See Azure v. City of Billings*, 596 P.2d 460, 470 (Mont. 1979) (citing *Tice*, 199 P.2d 1).

Second, they contend that the district court violated the "empty chair" rule by factoring Kalahar's negligence in the allocation of 50% liability to

Court the determinative question of the appropriate standard of care by way of an earlier published opinion in this matter. Having received that court's response, *Oberson v. U.S. Dep't of Agric.*, 171 P.3d 715 (Mont. 2007), we now amend our prior opinion and affirm the district court's judgment in all respects.

## II.   FACTS

### A.   THE ACCIDENT

On February 25, 1996, Musselman, an expert snowmobiler, joined friends to ride on snowmobile trails in Yellowstone National Park and Gallatin National Forest. After dark, Musselman and his friends rode to a restaurant some nine miles north of West Yellowstone, Montana. Musselman, joined by Kalahar, Johnson, and Leinberger, rode on the Big Sky Trail, a groomed snowmobile trail managed by the Forest Service. During the trip, Johnson and Kalahar were riding competitively at speeds up to 60 mph.

At the restaurant, Musselman and his friends joined a group of some twenty people to cook steaks, drink beer, and tell stories. Musselman and Kalahar each drank at least three beers, Johnson consumed three to four beers, and Leinberger consumed between four and eight beers. Upon leaving the restaurant around 10:00 p.m., Leinberger was heavily impaired by alcohol, Johnson and Kalahar were impaired to a lesser

---

Kalahar and Leinberger. The court, however, specifically acknowledged that no liability can be apportioned to a defendant who has settled and allocated liability solely to Leinberger. *See Azure*, 596 P.2d at 469.

Third, they contend that the district court erred in accepting the Forest Service's expert's estimate of Musselman's life expectancy, which did not take into account the quality of medical care provided to Musselman. The court's life expectancy finding is a finding of fact reviewed for clear error. The finding was supported by substantial evidence and has not been shown to be clearly erroneous. *Sines v. United States*, 430 F.2d 644, 644-645 (9th Cir. 1970).

degree, and Musselman was not impaired and was fully able to operate his snowmobile.

Musselman and Johnson left the restaurant first, followed by Kalahar and Leinberger. No member of the group had previously traveled on the stretch of the Big Sky Trail immediately adjacent to the restaurant. The Forest Service had posted a speed limit of 45 mph on its Yellowstone-area trails, but was aware that snowmobilers regularly traveled this stretch of trail at speeds in excess of 60 mph. Musselman took off quickly from the restaurant and continued at a pace keeping him in front of the other riders. He was not exceeding 45 mph when he reached the accident site. Johnson, Kalahar, and Leinberger approached the accident site at approximately 50-55 mph.

The stretch of trail approaching the accident site is flat and smooth for roughly a quarter of a mile. It then drops suddenly down a steep hill to the site of the accident, losing seventeen feet of elevation over approximately eighty feet, an 11.5 degree pitch or 25% slope. Musselman was the first rider to come to the hill, negotiating it safely and landing his snowmobile under control slightly off the trail. Johnson was next over the hill, crashing his machine at the bottom. After Johnson's crash, Musselman left his machine for reasons unknown, although the district court assumed he was likely trying to help Johnson or warn the approaching riders of the trail's drop. As Musselman entered on the trail, Kalahar and Leinberger came flying over the hill side-by-side. One of the two riders hit Musselman's head, causing catastrophic brain injuries. The injury left Musselman unable to swallow, speak, understand complex communication, and independently conduct activities of daily living. He currently resides in an adult care facility.

The court had difficulty reconstructing the scene immediately following the accident given the shambolic post-

accident investigation.[3] However, it found that Musselman was lying on the groomed portion of the trail between his and Leinberger's machine, with his head facing away from the hill. Leinberger's machine was still on the groomed trail with its front end, windshield, handlebars, tunnel area, skis, cowling, rear bench rest, and motor mounts damaged. Kalahar's machine suffered broken engine mounts, a damaged windshield, and bent handlebars. Johnson's machine had a damaged windshield, which he replaced the morning after the accident before the machine could be inspected.

There were no eyewitnesses to the accident. Leinberger testified that he did not believe he hit Musselman because he "didn't hit an object that was going to move." Kalahar testified that he was positive he did not hit Musselman. Physical evidence and attempts at reconstruction revealed only that a snowmobile track hit Musselman on the helmet while he was on the trail and that the impact came from the right to left side.

Plausible explanations can be given for either Leinberger or Kalahar hitting Musselman. Leinberger's machine tumbled after the crest of the hill either because he applied his brakes before becoming airborne or because he hit Musselman while airborne, forcing the nose of his snowmobile down. Alternatively, the line of travel for Kalahar's machine places it in line with Musselman's likely location at the moment of the accident. Additionally, Kalahar reported hitting the ground and bouncing, an account consistent with hitting Musselman and then hitting the ground.

---

[3]The investigators lost notes they had taken that night, took only two photographs of the scene, did not prevent the snowmobiles from being moved, spoiled the blood sample drawn from Musselman the night of the accident, and did not order blood drawn from the other riders involved in the accident.

## B.  THE TRAIL

Musselman's accident occurred at a sudden and steep drop on the Big Sky Trail. At the time of the accident, there were no signs warning of the drop or instructing riders to slow down. Numerous witnesses suggested at trial that it was unusual for such a drop not to be signed and that a trail of such abrupt steepness was rare.

The Forest Service has sole responsibility for identifying and correcting hazards on the Big Sky Trail. To identify hazards, the Forest Service engages in a process called "warranting." The program manager for the Gallatin National Forest described the process as "identifying the hazards that our average, prudent, reasonable rider would not expect based on a spectrum of users that we had out there." Forest Service employees identify hazards during warranting by riding the trail at 35 mph during the day. Upon identifying a hazard, the Forest Service closes the trail, corrects the hazard, or warns the user. The Forest Service does not warrant trails at night, on the assumption that reflectors and a rider's judgment as to the appropriate speed will provide sufficient protection.

The Forest Service originally warranted the Big Sky Trail in 1993, at which point it did not identify the hill as a hazard.[4] The speed limit at the site of the accident, as on all other trails in the region, was then 35 mph. A month before the accident, the Forest Service implemented a new speed limit of 45 mph solely for consistency with the speed limit in effect in adjacent Yellowstone National Park. The Forest Service did not warrant the trails at 45 mph.

---

[4]Following the accident, in November 1996, the Forest Service rewarranted the trail, making several adjustments at the site of the accident. The Service realigned the approach to the hill, replacing the straight, flat approach with a curve leading through trees. Additionally, signs were added indicating the upcoming curve and hill. The warranting form also noted that the hill can "sneak up on a person" at night and that the hill's crown was scheduled for reduction.

Sixteen days before Musselman's accident, two snowmobiles and a snow grooming machine were involved in an accident at the hill in question. The snowmobiles were traveling in clear weather at night, going 35-40 mph, which the investigation report characterized as too fast based upon the conditions. The two snowmobiles collided with the grooming machine immediately after coming over the crest of the hill. In a Forest Service re-creation following the accident, an observer 100 feet back from the hill could not see the grooming machine, equipped with two headlights and a flashing light on top, when it was at the bottom of the hill. Although the collision caused only minor damage to the involved machines and no personal injury, the district court found that the accident could have resulted in serious injury to the riders.

## C.  THE DISTRICT COURT DECISION

The district court held that the Forest Service's decisions whether to warrant the trails and how it would conduct the process were grounded in policy considerations and were the type of discretionary decisions Congress intended to shield from tort liability. Once the decision to warrant the trails was made, however, the Service had a duty to accomplish that task with reasonable care. The Service's failure to warn of the hazardous hill was not the result of a decision grounded in public policy or of a choice among competing policy considerations. The court concluded that the Forest Service's failure to correct or warn of this hazard was not the type of discretionary decision that is shielded from tort liability.

Having determined that it had jurisdiction, the district court then applied the Montana snowmobiling statute. MONT. CODE ANN. §§ 23-2-651, 653, 654 (1996). It first held the gross negligence standard of the statute as originally enacted in 1987 to be unconstitutional on the authority of *Brewer v. Ski-Lift, Inc.*, 762 P.2d 226 (Mont. 1988). It then applied the standard established by the statute as amended in 1999, imposing a duty of reasonable care on snowmobile area operators "except for the

risks inherent in the sport of snowmobiling." § 23-2-653(3). The term inherent risk is defined in the statute as including "variations in terrain." MONT. CODE ANN. § 1346(b)(1). The court rejected the Forest Service's argument that the hazardous hill on the trail was a "variation in terrain," reasoning that the Service had notice of the danger and could have eliminated it with ordinary care by altering the trail or posting a warning. It concluded that by failing to reduce the steep grade of the hill or warning snowmobilers of the hazard, the Forest Service breached its duty and that the breach contributed to Musselman's injuries.

The court next considered whether any of the other parties shared responsibility for the accident. It concluded that Musselman exposed himself to severe injury by walking onto the trail and, further, that Leinberger and Kalahar, given their speed and alcohol-impaired state, and the evidence of contact with Musselman, breached their duty to avoid injury to others. Since it proved impossible to determine whether it was Leinberger or Kalahar who hit Musselman, the court held both jointly and severally liable for Musselman's injuries.

The court apportioned 40% of the liability to the Forest Service, 10% to Musselman, and 50% to Kalahar and Leinberger. Since Kalahar had settled with Musselman and been dismissed from the suit as a result of this settlement, the court assigned the 50% share of liability solely to Leinberger on the ground that he and Kalahar had acted in concert. In calculating damages, the district court used a future life expectancy of 12.8 years. After reducing the amount by 10% for Musselman's liability, the court entered judgment for plaintiffs against the United States in the amount of $4,518,720 and against Leinberger in the amount of $5,648,400.

## III.    DISCUSSION

## A.    FTCA's DISCRETIONARY FUNCTION EXCEPTION

[1] The District Court's jurisdiction arose under 28 U.S.C. § 1346(b)(1) imposing liability on the United States for "personal injury . . . caused by the negligent . . . act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Under section 2680(a), however, no liability lies for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government . . . ." Pursuant to the two-prong test announced in *United States v. Gaubert*, 499 U.S. 315, 324-25 (1991), we ask first " 'whether the alleged wrongful conduct violated a specific and mandatory regulation or statute. If so, the conduct is outside the realm of discretion. If there is no mandatory regulation or statute involved, we then ask whether the conduct was susceptible to being based upon social, economic, or political policy.' " *Bolt v. United States*, No. 06-35993, 2007 WL 4225791, at *3 (9th Cir. Dec. 3, 2007) (quoting *Bibeau v. Pac. Nw. Research Found.*, 339 F.3d 942, 945 (9th Cir. 2003)). If the conduct involves choice or discretion, we must ask " 'whether that judgment is of the kind that the discretionary function exception was designed to shield.' " *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). The government bears the burden of proving that the discretionary function exception applies. *Id.*

[2] There is no serious claim that the Forest Service's actions in this case were mandated by regulation or statute. The question is whether its discretionary actions were policy

driven. The Forest Service argues that the absence of a warning sign at the hill was the direct result of the 1993 warranting process protected by the discretionary function exception. But as the Forest Service's brief explains, the warranting process was conducted at a route design speed of 35 mph and did not identify the hill as a hazard. Later, in 1996, the Service raised the speed limit to 45 mph—the limit in effect at the time of the accident—simply to conform to the speed limit in Yellowstone Park, resulting in the creation of the hazardous condition at the hill. Because the trails were never warranted at the higher speed limit of 45 mph, the Service is not shielded by the warranting process.

**[3]** The Service's argument that the decision not to rewarrant the trails in 1996 was protected by the discretionary function exception misses the point. Undoubtedly, its decision whether to warrant trails is protected. But not having warranted the trails at 45 mph, the Service cannot claim that its failure to warn of hazardous conditions at that speed is protected by the discretionary function exception.

**[4]** Inasmuch as the warranting process does not shield the Service under the circumstances of this case, we must consider whether the failure to post a warning at the hill is protected by the discretionary function exception. Whether it is protected depends on whether the Service's action—or inaction—was grounded in social, economic or political policy. Other than its (misplaced) reliance on the 1993 warranting process, the Service offers no evidence to show that its failure to post a warning was the result of a policy decision. This case is unlike *Childers v. United States*, 40 F.3d 973 (9th Cir. 1995), where the decision not to post signs and to close portions of Yellowstone National Park was the result of policy decisions regarding how best to manage the park during winter. The court explained:

> Unable to maintain all the trails in the park, cognizant that posting warning signs would inadvertently

attract visitors to unmaintained trails, and unable to post signs throughout the park, NPS could only decide to close large portions of the park, or to keep the park open, provide visitors with information on the hazards, and take steps to discourage visitors from going to hazardous areas.

*Id.* at 976. Similarly, in *Valdez v. United States*, 56 F.3d 1177 (9th Cir. 1995), the failure to install warning signs alongside a potentially hazardous stream was held to "implicate[ ] a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards." *Id.* at 1180; *see also Blackburn v. United States*, 100 F.3d 1426, 1434 (9th Cir. 1996) (following *Valdez* and *Childers*, holding the decision how to warn the public of the hazard of diving off a bridge in Yosemite National Park involved considerations of visitor enjoyment, preservation of historical features, minimization of manmade intrusions and protection of wildlife and the environment).

The case before us presents a different context. It is more nearly analogous to cases such as *Summers v. United States*, 905 F.2d 1212, 1215-16 (9th Cir. 1990), holding that the discretionary function exception did not protect the Park Service where it had failed to warn visitors of the danger of stepping on hot coals in a fire ring in the Golden Gate National Recreation Area. The court found that "NPS's failure to identify and warn of the danger to barefoot visitors of hot coals on park beaches resembles more a departure from the safety considerations established in Service policies . . . than a mistaken judgment in a matter clearly involving [policy] choices . . . ." *Id.* at 1216. Similarly, in *Faber v. United States*, 56 F.3d 1122, 1127 (9th Cir. 1995), we held that the Forest Service's failure to post a sign warning of danger of diving off a waterfall in a National Forest was not protected by the discretionary function exception. We stated that "[i]t would be wrong to apply the discretionary function exception in a case where a

low-level government employee made a judgment not to post a warning sign . . . ." *Id.* at 1125. And in *Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994), we held the Navy's decision not to post speed limit signs after creating a hazard to navigation was not protected by the discretionary function exception, stating that "[a] decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect." *See also Seyler v. United States*, 832 F.2d 120, 123 (9th Cir. 1987) (stating "we doubt that any decision not to provide adequate signs would be of the nature and quality that Congress intended to shield from tort liability") (internal quotation marks and citation omitted).

[5] Here, the Forest Service knew of the hazard through its own investigation, which disclosed that sixteen days prior to Musselman's accident the hill in question had been the site of a potentially serious collision between a snow grooming machine and two snowmobiles. In the absence of any evidence that the failure to post a warning or remedy the hazard was the product of a policy choice, we conclude that the discretionary function exception did not shield the Forest Service from liability.

## B. THE FOREST SERVICE'S NEGLIGENCE

[6] We turn next to the question whether Montana law imposed a duty on the Forest Service to remedy or warn of the hazardous condition on the trail. *See Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006) (in assessing liability under the FTCA, court applies the law of the state in which the alleged tort occurred). Under Montana law, a negligence action requires proof of four elements: existence of a duty; breach of the duty; causation; and damages. *Gentry v. Douglas Hereford Ranch, Inc.*, 962 P.2d 1205, 1209 (Mont. 1998).[5]

---

[5]The Forest Service does not dispute the trial court's damage award.

**[7]** In its certification decision, the Montana Supreme Court essentially adopted the reasoning of the district court. *Oberson v. U.S. Dep't of Agric.*, 171 P.3d 715 (Mont. 2007). Applying the rationale of *Brewer* to the snowmobiling statute, the court held that its gross negligence standard violated the equal protection clause of the Montana Constitution. *Id.* at 720 (citing MONT. CONST. art. II, § 4). Next, it rejected the Service's argument that in the absence of the gross negligence standard, the willful or wanton misconduct standard of the recreational use statute, MONT. CODE ANN. § 70-16-302(1) (1995), should apply. It held that while it had struck the gross negligence standard, the snowmobile statute otherwise remained in effect governing the duties of snowmobile area operators. Accordingly, "[t]he more general recreational use statute's willful or wanton misconduct standard of care, § 70-16-302(1), MCA (1995), has no application under these circumstances." *Id.* at 721-22. Finally, the court concluded, following its decision in *Mead v. M.S.B., Inc.*, 872 P.2d 782 (Mont. 1994), that in the absence of the gross negligence standard, "the general statutory duty of due care, set forth in § 27-1-701, MCA, provides the standard of care to govern the Forest Service's actions in this case." *Id.* at 722.

**[8]** Under Montana law the duty element of negligence turns primarily on foreseeability. *Lopez v. Great Falls Pre-Release Servs., Inc.*, 986 P.2d 1081, 1086-87 (Mont. 1999). Whether the Forest Service owed a duty to Musselman depends on whether it could reasonably foresee an unreasonable risk of harm to users of the snowmobile trail. *Id.*; *see also Busta v. Columbus Hosp. Corp.*, 916 P.2d 122, 134 (Mont. 1996) (" 'Duty . . . is measured by the scope of the risk which negligent conduct foreseeably entails.' ") (quoting *Mang v. Eliasson*, 458 P.2d 777, 781-82 (Mont. 1969)). The Forest Service argues that whatever risk was foreseeable, there was no breach of duty because Montana's snowmobile statute places all legal responsibility for risks "inherent in the sport of snowmobiling" on the snowmobiler. MONT. CODE ANN. § 23-2-654(3) (1996). It argues that the statute relieved the

government of liability for the failure to warn Musselman of the "variation[ ] in terrain" on which he was injured. § 23-2-654(1). We agree with the district court that the argument is foreclosed by *Brewer*, which limited the range of inherent risks to those "that are essentially impossible to eliminate by the ski area operator." *Brewer*, 762 P.2d at 231. The risk under consideration is not a variation in terrain but a hazardous condition of the trail which could with reasonable care have been readily eliminated by altering the trail or posting a warning sign.

Finally, the Forest Service contends that there was no causal relationship between the absence of a warning and Musselman's injury. We review a district court's findings of both cause-in-fact and proximate cause for clear error. *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002) (reviewing mixed questions of law and fact regarding proximate cause); *United States v. Hackett*, 311 F.3d 989, 991 (9th Cir. 2002) (reviewing factual findings regarding causation).

**[9]** "[A] party's conduct is a cause-in-fact of an event if the event would not have occurred but for that conduct." *Gentry*, 962 P.2d at 1209 (internal quotation marks and citation omitted). The record established that when approaching the hill at only 35 mph (below the speed limit), a snowmobile would leave the ground and sail over the crest of the hill with the operator losing control and unable to see objects at the foot of the hill, as occurred in the earlier collision of a snowmobile with the snow groomer at the same location. As the district court found, "[p]lacing a sign on the approach to this hill would have changed the riders' expectancies and informed them that the approaching hill was far steeper than the usual gentle grade." *Oberson*, 311 F. Supp. 2d at 959. Musselman, having landed off the trail, saw Johnson on the trail and reentered it, as the court found, to assist or warn the other snowmobilers of the danger. He was hit when Kalahar and Leinberger, unwarned, sped over the hill's crest and lost control of their snowmobiles as a result of the unexpected steep

grade. Cause-in-fact, therefore, was established on the record which showed that the Service's conduct, "in a natural and continuous sequence . . . helped produce [Musselman's] injury and [the injury] would not have occurred without it." *See Busta*, 916 P.2d at 139.

The Service's principal contention is that Kalahar's and Leinberger's speed and intoxication combined with Musselman's carelessness in entering the trail were independent intervening causes. Even if its failure to post a warning sign were found to be a cause-in-fact of Musselman's injuries, the Service argues, the riders' acts were unforeseeable intervening causes, sufficient to prevent a finding that the Service's failure to warn was a proximate cause of the accident.

Where, as here, the existence of independent intervening acts is alleged, causation requires proof of both cause-in-fact and proximate cause. *Gentry*, 962 P.2d at 1209. "When two or more causes concur to bring about an event, then cause-in-fact is established by the 'substantial factor' test." *Sletteland v. Roberts*, 16 P.3d 1062, 1067 (Mont. 2000) (citation omitted). Under that test, a party held to have contributed to an event is not "absolved from that responsibility upon the ground that the identical harm would have occurred without [its involvement]." *Rudeck v. Wright*, 709 P.2d 621, 628 (Mont. 1985). As the foregoing discussion shows, the Service's maintaining the hazardous and unwarned condition of the hill contributed to the event in which Musselman was injured.

**[10]** Proximate cause is established when a party could reasonably foresee that its conduct would result in injury. *Busta*, 916 P.2d at 135. An independent intervening act will not bar liability if it is "one that the defendant might reasonably foresee as probable or one that the defendant might reasonably anticipate under the circumstances." *Estate of Strever v. Cline*, 924 P.2d 666, 672 (Mont. 1996). However, "[t]he particular resulting injury need not have been foreseeable."

*Hinkle v. Shepherd Sch. Dist. No. 37*, 93 P.3d 1239, 1245 (Mont. 2004). That serious accidents involving snowmobiles could occur at the site of the hill was foreseeable. The district court found that the potential severity of the earlier snow groomer accident, even though no one was injured, placed the Service on notice that serious injury could result from its failure to post a warning. That riders would operate snowmobiles negligently was foreseen by the Forest Service. Its awareness of riders' high speeds was a motivation for implementing a trail warranting process. And its awareness of intoxicated persons operating snowmobiles is reflected in the Code of Federal Regulations' express prohibition of operation of a snowmobile while intoxicated in a National Park or Forest. 36 C.F.R. §§ 2.18, 4.23 (1996). Thus, Kalahar's and Leinberger's negligence was foreseeable.

[11] The Montana Supreme Court has long recognized the rescue doctrine.[6] Under that doctrine, "one who, observing another in peril, voluntarily exposes himself to the same danger in order to protect him . . . may recover for any injury sustained in effecting the rescue, against the person through whose negligence the perilous condition has been brought about . . . ." *Bracey v. Nw. Improvement Co.*, 109 P. 706, 707 (Mont. 1910); *see also Brown v. Columbia Amusement Co.*, 6 P.2d 874, 878 (Mont. 1931). Although the cases speak broadly in terms of liability, they recognize that liability is intertwined with causation in the application of the doctrine. Thus, in *Kiamas v. Mon-Kota, Inc.*, 639 P.2d 1155, 1159 (Mont. 1982), the court held that causation had not been established where action was no longer required to avert a threatened harm. In its discussion of "Scope of Liability (Proximate Cause)," the Restatement of Torts (Third) (Pro-

---

[6]"Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable." *Wagner v. Int'l Ry. Co.*, 133 N.E. 437, 437 (N.Y. 1921) (Cardozo, J.).

posed Final Draft) states, with respect to rescuers, "[t]he aspect relevant to scope of liability provides that an actor, whose tortious conduct puts the actor or another at risk, is subject to liability to a third person who is injured while attempting to come to the aid of the actor or the other imperiled person." § 32 cmt. b (2005). Musselman's entry onto the trail, the district court found, was a response to the peril created by the Forest Service to warn or give aid to other snowmobilers. As such, it was a foreseeable consequence of the Service's negligence.

## CONCLUSION

For the reasons stated, the judgment is affirmed.